UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEAN MOSER, an individual, THOMAS OVERLY, an individual, DAVID RANEY, an individual, REAGAN JANSON, an individual, MICHIGAN COALITION FOR RESPONSIBLE GUN OWNERS, MICHIGAN GUN OWNERS, MICHIGAN OPEN CARRY, and NATIONAL RIFLE ASSOCIATION OF AMERICA,

Plaintiffs,

v

DANA NESSEL, in her official capacity as Attorney General of the State of Michigan, COLONEL JAMES GRADY II, in his official capacity as Director of the Michigan State Police, CITY OF BATTLE CREEK, SHANNON BAGLEY, in his official capacity as Chief of Police of the City of Battle Creek, CITY OF TROY, JOSH JONES, in his official capacity as the Chief of Police of the City of Troy, CITY OF KENTWOOD, BRYAN LITWIN, in his official capacity as Chief of Police of the City of Kentwood, SHERIFF RICHARD FULLER III, in his official capacity as Sheriff of Kalamazoo County, CITY OF WALKER, and KEITH MANKEL, in his official capacity as Chief of Police of the City of Walker,

Defendants.

No. 1:26-cv-1850

HON. ROBERT J. JONKER

MAG. PHILLIP J. GREEN

---

Steven W. Dulan (P54914)
LAW OFFICES OF STEVEN W. DULAN, PLC
Attorney for Overly, Raney, and Michigan Coalition for Responsible Gun Owners
5311 Park Lake Road
East Lansing, MI 48823
(517) 332-3149
swdulan@stevenwdulan.com

Adam R. de Bear (P80242)
Christopher M. Allen (P75329)
Daniel J. Ping (P81482)
Mich. Dep’t of Attorney General
Attorneys for Nessel and Grady II
525 W Ottawa St
Lansing, MI 48933
(517) 335-7573

Thomas J. Lambert (P86348)
OUTSIDE LEGAL COUNSEL, PLC
Attorney for Moser, Janson, and Michigan Open Carry
PO Box 144
Jamestown, MI 49427
(616) 275-2976
tlambert@olcplc.com

Dean G. Greenblatt (P54139)
DEAN G. GREENBLATT, PLC
Attorney for Moser, Janson, and Michigan Open Carry
4190 Telegraph Road, Suite 3500
Bloomfield Hills, MI 48302
(248) 644-7520
dgg@mnsi.net

James J. Makowski (P62115)
MAKOWSKI LEGAL GROUP, PLC
Attorney for Michigan Gun Owners
18306 Middlebelt Rd.
Livonia, MI 48152
(313) 434-3900
jmakowski@makowskilegal.com

Terry L. Johnson (P70773)
LAW OFFICE OF TERRY L. JOHNSON, PLC
Attorney for Michigan Gun Owners
2915 Biddle Ave Ste 200,
Wyandotte, MI 48192
(313) 421-6193
terryljohnson00@gmail.com

Joseph G.S. Greenlee
National Rifle Association – Institute for Legislative Action
Attorney for NRA
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

debeara@michigan.gov
allenc28@michigan.gov
pingd@michigan.gov

William Y. Kim (P76411)
Attorney for Battle Creek and Bagley
City Attorney, Battle Creek
10 N Division St., Ste. 207
Battle Creek, MI 49014
(269) 966-3385
wykim@battlecreekmi.gov

Lori Grigg Bluhm (P46908)
Attorney for Troy and Jones
City Attorney, Troy
500 W Big Beaver Rd.
Troy, MI 48084
(248) 524-3323
bluhmlg@troymi.gov

Patrick E. Sweeney (P79822)
Attorney for Kentwood, Walker Litwin, and Mankel
BLOOM SLUGGETT, PC
161 Ottawa Ave., NW, Ste. 400
Grand Rapids, MI 49503
(616) 591-1878
patrick@bloomsluggett.com

Lynn L. Corgan (P39840)
Kalamazoo Co. Corporate Counsel
Attorney for Fuller III
201 W Kalamazoo Ave., Rm. 207
Kalamazoo, MI 49007
(269) 385-8529
llcorg@kalcounty.com

__________________________________________/

**NESSEL AND GRADY'S**
**BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS**

Adam R. de Bear (P80242)
Daniel J. Ping (P81482)
Assistant Attorneys General

Christopher M. Allen (P75329)
Assistant Solicitor General

Attorneys for Nessel and Grady II
Mich. Dep't of Attorney General
525 W Ottawa St
Lansing, MI 48933
(517) 335-7573
debeara@michigan.gov
pingd@michigan.gov
allenc28@michigan.gov

Dated: September 4, 2026

## TABLE OF CONTENTS

Page


Table of Contents ..... i

Index of Authorities ..... iii

Concise Statement of Issues Presented ..... ix

Controlling or Most Appropriate Authority ..... ix

Introduction ..... 1

Statement of Facts ..... 3

Standard of Decision ..... 10

Argument ..... 12

I. Because Michigan's LTP framework does not violate the Second Amendment right to keep and bear arms, Plaintiffs' first and third claims must be dismissed. ..... 12

A. Shall-issue laws are presumptively constitutional under *Bruen*, and facial challenges to them are not subject to *Bruen*'s text-and-history analysis. ..... 13

1. The Supreme Court places shall-issue licensing regimes outside of *Bruen*'s historical analysis. ..... 13

2. The Supreme Court has endorsed similar shall-issue regimes like § 2 as presumptively constitutional. ..... 17

B. Michigan's LTP framework is consistent with the Nation's historical tradition of firearm regulations. ..... 20

1. When a firearm regulation is consistent with principles that underpin our country's regulatory tradition, the regulation does not violate the Second Amendment. ..... 20

2. Michigan's scheme only targets an individual's dangerousness, which the Supreme Court has repeatedly pronounced as appropriate. ..... 22

3. Section 2 provides narrow, objective, and definite standards to guide law enforcement officials in the processing of LTP application. .... 24

4. This Nation's historical tradition of firearm regulations reinforces the constitutionality of Michigan's LTP framework. .... 26

a. Disarmament Laws .... 27

b. Surety Laws .... 34

5. Similar state laws permitting regimes have been found consistent with our Nation's history of firearm laws. .... 36

C. Requiring the provision of and government retention of accurate information about pistol purchasers is a de minimis "presumptively lawful regulatory measure." .... 39

II. Because Michigan's LTP scheme provides sufficient procedural due process, Plaintiffs' fifth and seventh claims must be dismissed. .... 44

A. Section 2(3)'s probable-cause exception comports with the Fourteenth Amendment's Due Process Clause. .... 44

1. Section 2(3)'s probable-cause exception provides adequate and sufficiently clear notice. .... 44

2. Section 2(3)'s probable-cause exception provides adequate pre- and post-deprivation process. .... 46

B. Section 2(5)'s reporting obligation does not implicate Plaintiffs due process rights. .... 48

III. In their as-applied challenges, Plaintiffs fail to allege any personal involvement by Nessel and Grady in the alleged deprivation of their Second and Fourteenth Amendment claims. .... 50

Conclusion and Relief Requested .... 52

## INDEX OF AUTHORITIES

Page

**Cases**


*Abramski v. United States*,
573 U.S. 169 (2014) .......... 43

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) .......... 24, 36, 38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 11

*B & L Prods., Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024) .......... 16

*Binno v. Am. Bar Ass'n*,
826 F.3d 338 (6th Cir. 2016) .......... 51

*Blankenship v. Louisville-Jefferson Cnty., Kentucky Metro Gov't*,
162 F.4th 644 (6th Cir. 2025) .......... ix, 45

*Brackett v. Focus Hope, Inc.*,
482 Mich. 269 (2008) .......... 25

*Brinegar v. United States*,
338 U.S. 160 (1949) .......... 25, 45

*Brown v. City of Albion*,
136 F.4th 331 (6th Cir. 2025) .......... 45

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015) .......... 11

*Devenpeck v. Alford*,
543 U.S. 146 (2004) .......... 25, 26, 45

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... passim

*Dwyer v. Farrell*,
193 Conn. 7, 475 A.2d 257, 260 (1984) .......... 18

*Gadomski v. Tavares*,
113 A.3d 387 (2015) .......... 18

*Gen. Aviation, Inc. v. Capital Region Airport Auth.*,
569 N.W.2d 883 (Mich. Ct. App. 1997) .......... 49

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .......... 45

*Heller v. D.C.*,
670 F.3d 1244 (D.C. Cir. 2011) .......... 43

*Huddleston v. United States*,
415 U.S. 814 (1974) .......... 43

*Illinois v. Gates*,
462 U.S. 213 (1983) .......... 25

*In re Payne*,
514 N.W.2d 121 (Mich. 1994) .......... 7, 48

*Kanter v. Barr*,
919 F.3d 437, 451 (7th Cir. 2019) .......... 24, 28, 31

*Konigsberg v. State Bar of Cal.*,
366 U.S. 36, 50 n.10 (1961) .......... 21

*Koons v. Att'y Gen. New Jersey*,
156 F.4th 210 (3d Cir. 2025) .......... 29, 30

*Koons v. Platkin*,
673 F. Supp. 3d 515 (D. N.J. 2023) .......... 29, 37

*Leary v. Daeschner*,
228 F.3d 729 (6th Cir. 2000) .......... 47

*Logsdon v. Hains*,
492 F.3d 334 (6th Cir. 2007) .......... 26

*Macomb Intermediate Sch. Dist. v. State*,
___ N.W.3d ___ (Mich. Ct. App. 2026) .......... 50

*Maryland Shall Issue, Inc. v. Moore*,
116 F.4th 211 (4th Cir. 2024) .......... 17

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 46

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ........................................................................16, 23, 24

*McRorey v. Garland*,
99 F.4th 831 (5th Cir. 2024) .................................................................................16

*Midland Cogeneration Venture Ltd. P'ship v. Naftaly*,
N.W.2d 674 (Mich. 2011) ....................................................................................48

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
597 U.S. 1 (2022) ..........................................................................................passim

*Oakland Tactical Supply, LLC v. Howell Township*,
103 F.4th 1186 (6th Cir.) (2024) ...................................................................ix, 40, 41

*People v Champion*,
549 N.W.2d 849 (Mich. 1996) ................................................................................25

*People v. Langston*,
35 N.W.3d 381 (Mich. Ct. App. 2024) .....................................................................17

*People v. Skinner*,
917 N.W.2d 292 (Mich. 2018) ................................................................................50

*Pineda v. Hamilton Cnty.*,
977 F.3d 483 (6th Cir. 2020) ..................................................................................51

*Riverview Health Inst. LLC v. Med. Mut. of Ohio*,
601 F.3d 505 (6th Cir. 2010) ..................................................................................11

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) .................................................................................16

*Sedita v. United States*,
763 F. Supp. 3d 63 (D.D.C. 2025) ..........................................................................17

*Shoemaker v. City of Howell*,
795 F.3d 553 (6th Cir. 2015) ..................................................................................47

*Sir John Knight's Case*,
87 Eng. Rep. 75 (K.B. 1686) ..................................................................................27

*United States v. Holden,*
70 F.4th 1015 (7th Cir. 2023) .................................................................................43

*United States v. Knipp*,
138 F.4th 429 (6th Cir. 2025) ............................................................................16, 40

*United States v. Manney*,
114 F.4th 1048 (9th Cir. 2024) .......... 42

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... passim

*United States v. Scheidt*,
103 F.4th 1281 (7th Cir. 2024) .......... 41

*United States v. Tobias*,
103 F.3d 131 (6th Cir. 1996) .......... 11

*United States v. Williams*,
113 F.4th 637 (6th Cir. 2024) .......... passim

William Hawkins, *A Treatise of the Pleas of the Crown* ch. 63, §§ 4, (6th ed. 1788) .......... 28

*Zillow, Inc. v. Miller*,
126 F.4th 445 (6th Cir. 2025) .......... 11

**Statutes**

42 U.S.C. § 1983 .......... ix, 50

Colo. Rev. Stat. § 18-12-203(2) .......... 18

Conn. Gen. Stat. § 29–28(b) .......... 16

Iowa Code § 724.8(3) .......... 18

Mass. Rev. Stat., ch. 134, § 16 (1836) .......... 34

Mich. Comp. Laws § 28.421(c) and (i) .......... 2

Mich. Comp. Laws § 28.422 .......... ix, 10

Mich. Comp. Laws § 28.422 and (2) .......... 51

Mich. Comp. Laws § 28.422(1) .......... 2

Mich. Comp. Laws § 28.422(3) .......... passim

Mich. Comp. Laws § 28.422(3)(a)–(h) .......... 3

Mich. Comp. Laws § 28.422(4) .......... 3

Mich. Comp. Laws § 28.422(5) ....................................................... 4, 9, 38

Mich. Comp. Laws § 28.422(6) ....................................................... 4

Mich. Comp. Laws § 28.422a(1)(d) ....................................................... 3

Mich. Comp. Laws § 28.424(3) ....................................................... 33

Mich. Comp. Laws § 28.426(1)(a) ....................................................... 3

Mich. Comp. Laws § 600.615 ....................................................... 5

Mich. Comp. Laws § 8.3a ....................................................... 24

Mich. Comp. Laws §§ 28.421–28.424 ....................................................... 2

Mich. Comp. Laws §§ 28.425–28.425 ....................................................... 2

Minn. Stat. § 624.7132, subd. 5(b) ....................................................... 17

Mont. Code § 45-8-321(2) ....................................................... 18

N.J. Stat. Ann. § 2C:58-3(c) ....................................................... 36

**Other Authorities**

1 *Journals of the American Congress*, at 285 (Washington, Way & Gideon 1823) ....................................................... 28

1 Records of the Governor and Company of the Massachusetts Bay in New England 211–12 (Nathaniel B. Shurtleff ed., 1853) ....................................................... 28

1 W. & M. Sess. 2, ch. 2, § 7 (Eng. 1689) ....................................................... 27

18 U.S.C. § 922(a)(6) ....................................................... 41

4 W. Blackstone, *Commentaries on the Laws of England* 251 (10th ed. 1787) (Blackstone) ....................................................... 34, 35

5 Blackstone, *Commentaries* 149 (St. George Tucker ed. 1803) (1767) ....................................................... 27, 28

*A Matter of Interpretation: Federal Courts and the Law* 38 (Amy Gutmann ed., 1997) ....................................................... 30

An Act for Constituting a Council of Safety, 1777 N.J. Laws 84, 90) ....................................................... 28

*Bruen's Preliminary Preservation of the Second Amendment*,
23 Federalist Society Review 279 (2022) .......... 13

*Disarming the Dangerous: The American Tradition of Firearm Prohibitions*,
16 Drexel L. Rev. 1, 3 (2024) .......... 26

Duke Center for Firearms Law, *Disarmament of those Disaffected to the Cause of America*, June 26, 2019 .......... 29

*Fidelity and Construction*,
129 Yale L.J. 774 (2020) .......... 30

*Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*,
95 Notre Dame L. Rev. 397 (2019) .......... 27

*Gun Rights, and the Shackles of History*,
73 Duke Law Journal 67 (2023) .......... 14

*Matter of M.U.'s Application for a Handgun Purchase Permit*,
475 N.J. Super. 148 (App. Div. 2023) .......... 27

Militia Act of 1662,
13 & 14 Car. 2, c. 3, § 13 (1662) .......... 28

*On the Methodology that Saved Most Gun Licensing*,
98 N.Y.U. L. Rev. 1928 (2023) .......... 14

Regulations respecting persons who are disarmed on account of their inimical principles (May 11, 1776) .......... 29

*The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*
25 Tex. Rev. L. & Pol. 245 (2021) .......... 34

**Rules**

Mich. Ct. R. 3.302(D) .......... 5

Rule 12(b)(6) .......... 9

**Constitutional Provisions**

Mass. Const. pt. 1, art. XVII (1780) .......... 29

Mich. Const. art. VI, § 28 .......... ix, 5, 6, 47

## CONCISE STATEMENT OF ISSUES PRESENTED

1. Michigan's license-to-purchase framework is a shall-issue licensing regime, and Plaintiffs' attacks on that regime fail either by being outside of the Second Amendment's text or as consistent with this Nation's history and tradition of firearm regulation. Should this Court dismiss Plaintiffs' facial Second Amendment attacks on Mich. Comp. Laws § 28.422?

2. Michigan's license-to-purchase framework affords adequate pre- and post-deprivation protections and provides a clearly intelligible, objective standard from both a law-enforcement and compliance standpoint. Given the adequate procedural protection and clarity of the framework, should this Court dismiss Plaintiffs' facial procedural-due-process attacks on Mich. Comp. Laws § 28.422?

3. To prevail on an as-applied challenge under 42 U.S.C. § 1983 and invoke Article III standing, a plaintiff must allege the defendant, by his or her own conduct, caused the deprivation of a constitutional right. Here, where Plaintiffs fail to make any such allegations against Defendants Nessel or Grady, should this Court dismiss the as-applied claims against Nessel and Grady?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Authority: *Blankenship v. Louisville-Jefferson Cnty., Kentucky Metro Gov't*, 162 F.4th 644, 661 (6th Cir. 2025);
*Mathews v. Eldridge*, 424 U.S. 319, 348 (1976);
Mich. Const. art. VI, § 28
*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022);
*Oakland Tactical Supply, LLC v. Howell Township*, 103 F.4th 1186, 1195 (6th Cir.) (2024)
*United States v. Rahimi*, 602 U.S. 680 (2024);
*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024);

## INTRODUCTION

Several individuals and organizations have filed both facial and as-applied challenges against the Attorney General, the Director of the State Police, and several municipalities and police officials, alleging that aspects of Michigan's shall-issue firearm licensing framework infringe upon their Second Amendment right to bear arms and their Fourteenth Amendment guarantee of procedural due process.

Plaintiffs bring a Second Amendment challenge to Michigan's law providing that local law enforcement may decline to grant a firearm license to a person where the police agency has "probable cause to believe the applicant is a threat to himself and others" or would commit a crime with the firearm. But Michigan's shall-issue licensing scheme is akin to those endorsed by the U.S. Supreme Court and is also consistent with our Nation's long history of withholding firearms from dangerous individuals. Plaintiffs also claim that the obligation for sellers to report sales of firearms to the licensing law enforcement agency violates the same protection, but the retention of accurate information about firearms transactions does not run afoul of the Second Amendment.

In their Fourteenth Amendment challenge, Plaintiffs claim that the assessment-of-dangerousness provision in Michigan's licensure regime lacks adequate procedural protections and confers standardless discretion on the police officials that process the license applications and that the reporting obligation places innocent purchasers at risk for a seller's failure to report. But Michigan law provides access to the courts for review of the officials' determinations and Plaintiffs misunderstand the operation of the failure-to-report provision.

Each of Plaintiffs' claims against the State Defendants fail. The facial challenges fail because not only are there numerous circumstances where the licensing framework's application is constitutional, but also because the framework is consistent with both the Second and Fourteenth Amendments. And the as-applied challenges as against the State Defendants fail because Plaintiffs have not alleged that either State Defendant engaged in conduct constituting an unconstitutional enforcement of the licensing scheme.

For these reasons and those set forth below, dismissal is required.

.

## STATEMENT OF FACTS

**Firearm licensure in Michigan**

As acknowledged in Plaintiffs' complaint, the licensure of firearms in Michigan takes place in two frameworks—the license-to-purchase (or LTP) framework under Mich. Comp. Laws §§ 28.421–28.424 and the concealed-pistol-license (or CPL) framework under Mich. Comp. Laws §§ 28.425–28.425x. Only the LTP framework is challenged in this litigation. (Compl., ¶ 48, ECF No. 1, PageID.13–14.) To this end, an overview of the LTP framework is warranted.

Under Mich. Comp. Laws § 28.422(1) (or referred to as § 2(1) for short), Michigan law prohibits both (a) the "[p]urchase, carry, possess[ion], or transport[ation of] *a pistol* in this state without first having obtained a license for the pistol" and (b) the "[p]urchase [of] *a firearm that is not a pistol* in this state without first having obtained a license for the firearm[.]" (Emphasis added.) "[F]irearm" to means "any weapon which will, is designed to, or may readily be converted to expel a projectile by action of an explosive" and "pistol" means a "firearm that is 26 inches or less in length" or a "firearm that by its construction and appearance conceals it as a firearm." Mich. Comp. Laws § 28.421(c) and (i). Thus, under these provisions, Michigan law requires a license to purchase, carry, possess, or transport a pistol, but it only requires a license to purchase a firearm that is not a pistol.[1]

---

[1] In fact, in addition to exempting federally licensed firearms dealers (or FFLs), CPL holders, and certified law enforcement officers, Michigan exempts from the LTP framework "individual[s] purchasing a firearm other than a pistol who has a

For LTPs, Michigan assigns local law enforcement agencies the primary responsibility of processing licensure applications. Specifically, Mich. Comp. Laws § 28.422(3) instructs that the director of the local law enforcement agency or their designee

> shall with due speed and diligence issue licenses to purchase, carry, possess, or transport firearms to *qualified applicants* unless the individual has probable cause to believe that the applicant would be a threat to the applicant or to other individuals, or would commit an offense with the firearm that would violate a law of this or another state or of the United States. [Emphasis added.]

The criteria for an individual to be a "qualified applicant" are set forth in Mich. Comp. Laws § 28.422(3)(a)–(h), and Plaintiffs have acknowledged that these criteria are consistent with what is required under the National Instant Criminal Background Check System (or NICS). (Compl, ¶ 53a, ECF No. 1, PageID.15; *see also* Mich. Comp. Laws § 28.426(1)(a) (preconditioning licensure on the agency first determining through NICS "that the applicant is not prohibited under federal law from possessing or transporting a firearm.").)

To begin the LTP application process, an applicant is required under Mich. Comp. Laws § 28.422(4) to "sign the application under oath on a form provided by the director of the department of state police." If the applicant is a "qualified applicant" and the law enforcement officer processing the application lacks "probable cause to believe that the applicant would be a threat to the applicant or to other individuals" or would otherwise use the firearm to break the law, the law

---

federal [NICS] background check performed on the individual by a [FFL] not more than 5 days before the purchase." *See* Mich. Comp. Laws § 28.422a(1)(d).

enforcement agency that processes the application will issue a license and provide a copies of the license to the applicant as well as to the State Police. Mich. Comp. Laws § 28.422(3). The applicant then has 30 days to purchase a firearm before the license expires. Mich. Comp. Laws § 28.422(4).

**Seller reporting requirements**

Michigan law also places obligations on those who sell firearms. Specifically, when "an individual purchases or otherwise acquires a firearm, the seller shall fill out the license forms describing the firearm, together with the date of sale or acquisition, and sign the seller's name in ink indicating that the firearm was sold to or otherwise acquired by the purchaser." Mich. Comp. Laws § 28.422(5). After completing the sale, the seller is required to "provide a copy of the license to the purchaser, and, if the firearm is a pistol, shall return 1 copy of the license to the licensing authority not later than 10 days after the date the pistol is purchased or acquired." *Id.* Sellers who fail to comply with these requirements are subject to a civil infraction and a $250 fine. *Id.*

Upon receiving the licensure paperwork from the seller, the law enforcement agency who issued the license is required to forward a copy of the license to the State Police and enter the information in the pistol entry database maintained by the State Police. Mich. Comp. Laws § 28.422(6). After purchasing the pistol, the "licensee may carry, use, possess, and transport the pistol for 30 days beginning on the date of purchase or acquisition only while the licensee is in possession of a copy of the license." *Id.* Should a license be misplaced during this 30-day period,

Michigan law entitles licensees to receive copies of the license from the licensing authority at a cost not to exceed one dollar. *Id.* And after this 30-day period, "the licensee is not required to have the license in the licensee's possession while carrying, using, possessing, or transporting the pistol[.]" *Id.*

**Michigan's appellate procedures**

Although the Firearms Act, within which the LTP framework is codified, does not explicitly provide a provision for an applicant to appeal a law enforcement agency's denial of license, Michigan's constitution guarantees an appeal for any individual aggrieved by a governmental agency's decision. In particular, MICH. CONST. art. VI, § 28 provides as follows:

> *All final decisions*, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, *shall be subject to direct review by the courts as provided by law*. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

(Emphases added.) To this end, the Michigan legislature has conferred upon the circuit courts "a general superintending control over all inferior courts and tribunals, subject to supreme court rule." Mich. Comp. Laws § 600.615. And the Michigan Court Rules establish that the circuit courts have jurisdiction to enforce the superintending control power over lower tribunals where no appeal in the circuit court is available. See Mich. Ct. R. 3.302(D).

In short, where Michigan's Legislature has not created a standalone statute authorizing an appeal from a local agency decision, "review is by complaint for

superintending control." *See In re Payne*, 514 N.W.2d 121, 125 (Mich. 1994). And because no hearing is required for a local law enforcement agency to deny an LTP application, the circuit court will assess whether the agency's denial was "authorized by law." See MICH. CONST. art. VI, § 28.

**Plaintiffs' lawsuit**

On June 14, 2026, four individuals and four organizational entities (collectively, Plaintiffs) filed the instant lawsuit against Attorney General Dana Nessel and State Police Colonel James Grady II (collectively, "the State") along with several local police agencies and their directors (collectively, "the Municipal Defendants"). Starting with the individual plaintiffs, Dean Moser, Thomas Overly, David Raney, and Regan Janson collectively allege that the LTP framework has been unconstitutionally applied to impede their efforts to purchase a pistol. (*See* Compl, ¶¶ 54–80.) Moser, Raney, and Janson allege, respectively, that the Troy, Battle Creek, and Kentwood Police Departments along with the Kalamazoo County Sheriff's Office denied their LTP applications under § 2(3)'s probable-cause exception. (*Id.*, ¶¶ 54–75.) Janson, on the other hand, was ultimately able to obtain a pistol after the Walker Police Department denied her LTP application under the probable-cause exception. (*Id.*, ¶¶ 76–80.) Having obtained a pistol, Janson alleges that the firearm has presumably "been registered with the State by the Seller" and also complains that she "had no control over the seller's submission of the registration paperwork" and that she received no "verifiable confirmation from the

seller or the state that the registration paperwork was properly submitted." (*Id.*, ¶¶ 80–81.)

Turning to the organizational plaintiffs, Michigan Coalition for Responsible Gun Owners (MCRGO), Michigan Gun Owners (MGO), Michigan Open Carry (MOC), and the National Rifle Association of America (NRA) each allege that they have been adversely affected and harmed by Michigan's LTP framework and represent the interest of their members who are being irreparably harmed by the LTP framework. (Compl, ¶¶ 10–14, PageID.5–6.) The organizational plaintiffs further allege that this lawsuit is brought on behalf of their members and that each organization meets the requirements for associational standing. (Compl, ¶¶ 84–88, PageID.21–22.)

As for the claims at issue in Plaintiffs' complaint, there are a mix of claims brought under 42 U.S.C. § 1983 alleging violations of the Second and Fourteenth Amendment. Plaintiffs' first claim alleges that Mich. Comp. Laws § 28.422(3) and its probable-cause exception are facially unconstitutional and violative of the Second Amendment's right to keep and bear arms. (Compl, ¶¶ 135–141, PageID.31–32.) Similarly, Plaintiffs' second claim is an as-applied one under the Second Amendment which asserts that § 2(3) was unconstitutionally applied to each individual Plaintiff as well as the members of the organizational plaintiffs. (Compl, ¶¶ 146–151.)

Turning to Plaintiffs' third claim, they allege that Mich. Comp. Laws § 28.422(5)—the requirement imposed on sellers to fill out the requisite sales records

and transmit to the licensing law enforcement agency—is facially unconstitutional in violation of the Second Amendment. (Compl, ¶¶ 152–163.) More specifically, Plaintiffs allege that this reporting requirement allows the State to "collect[ ] and maintain[ ] identifying information linking particular pistols to specific individuals" in a manner that "infringes the exercise of the right to keep and bear arms[.]" (*Id.*, ¶¶ 155, 160.) For their fourth claim, Plaintiffs bring a similar as-applied claim. (Compl, ¶¶ 164–177.) However, because Janson is the only individual Plaintiff that successfully purchased a pistol under the LTP framework, the as-applied challenge appears to be brought only by Janson and the organizational Plaintiffs. (See *id.*)

Moving to Plaintiffs' fifth claim, they bring a facial challenge under the Fourteenth Amendment alleging that Mich. Comp. Laws § 28.422(3)—specifically by way of its probable-cause exception and the absence of an internal appellate framework—violates the constitutional guarantee of procedural due process. (Compl, ¶ 178–196.) In particular, Plaintiffs allege that § 2(3)'s probable-cause exception "lacks narrow, objective, and definite criteria" and that "[i]t vests local licensing officials with broad discretion to decide who may acquire a protected arm." (*Id.*, ¶ 184.) Plaintiffs further allege that the LTP framework allows for no "no neutral decisionmaker, no adequate notice of disqualifying conditions, no mandatory disclosure of the information relied upon, no meaningful opportunity to contest adverse information, and no procedure capable of reliably correcting erroneous denials." (*Id.*, ¶ 188.) And for their sixth claim, Plaintiffs bring a

mirrored as-applied challenge under the Fourteenth Amendment. (Compl, ¶¶ 197–214.)

With their seventh claim, Plaintiffs invoke the Fourteenth Amendment to bring a facial challenge to the seller-reporting requirement in Mich. Comp. Laws § 28.422(5) alleging that the potential imposition of criminal penalties on pistol purchasers for failure of a third-party to report the transaction results in a deprivation of procedural due process. (Compl, ¶¶ 215–228.) And for their eighth and final claim, Janson and the organizational plaintiffs bring a mirror as-applied challenge under the Fourteenth Amendment alleging that the reporting of their personal information constituted a deprivation of their procedural due process rights. (Compl, ¶¶ 229–242.)

Because Plaintiffs make no specific allegations against the State in its as-applied challenges and neither Nessel nor Grady have any official responsibilities with respect to processing LTP applications, the State's response will focus on Plaintiffs' facial challenges (specifically, Plaintiffs' first, third, fifth, and seventh claims). And for the reasons set forth below in more detail, Plaintiffs' facial challenges under the Second and Fourteenth Amendments fail because they cannot establish that every application of Michigan's LTP framework will result in a constitutional violation.

## STANDARD OF DECISION

A motion to dismiss under Rule 12(b)(6) tests only the legal sufficiency of a complaint. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th

Cir. 2010). And a question regarding "[t]he constitutionality of a statute is a question of law." *United States v. Tobias*, 103 F.3d 131 (6th Cir. 1996).

To this end, because Plaintiffs bring both facial and as-applied challenges to the constitutionality of Mich. Comp. Laws § 28.422, it is worth reviewing the relevant standards for these respective challenges. To attain relief in a facial attack, a plaintiff must "establish that no set of circumstances exists under which the [law] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). In other words, to defeat a facial challenge, "the [g]overnment need only demonstrate that [the law] is constitutional *in some of its applications*." *Id*. (emphasis added). Unsurprisingly, the Supreme Court has categorized facial challenges as "the most difficult to mount successfully." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (cleaned up).

An as-applied challenge, on the other hand, alleges that the statute in question is unconstitutional as applied only to the party before the court. *See Zillow, Inc. v. Miller*, 126 F.4th 445, 455 (6th Cir. 2025). And as with all claims, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Here, Plaintiffs fail in both their facial and as-applied challenges. Plaintiffs cannot establish that there is "no set of circumstances" under which § 2 would be valid. *Rahimi*, 602 U.S. at 693. And Plaintiffs failed to allege "sufficient factual

matter" that Nessel and Grady engaged in any conduct that unconstitutionally applied the LTP framework to Plaintiffs. Dismissal is therefore required.

## ARGUMENT

### I. Because Michigan's LTP framework does not violate the Second Amendment right to keep and bear arms, Plaintiffs' first and third claims must be dismissed.

Section 2(3) of Michigan's shall-issue pistol permit regime (challenged in Plaintiffs' first and third claims) is valid and consistent the Supreme Court's Second Amendment jurisprudence. Plaintiffs' facial claims under the Second Amendment must be dismissed for three reasons.

First, the Court has endorsed shall-issue firearm permit regimes, including ones like Michigan's, as presumptively lawful, so the text-and-history test is, by the Supreme Court's own lights, inapplicable here. Second, even under the text-and-history test, the Nation's historical tradition of firearms regulation confirms that States have the authority to prohibit dangerous individuals from possessing firearms; § 2's challenged provision targets precisely that concern, denying a firearm purchase license where law enforcement finds probable cause the person would be a threat to himself, to others, or to commit a felony with the weapon. Third, § 2(5)'s reporting obligation is both outside the text of the Second Amendment and an example of a de minimis regulatory measure.

### A. Shall-issue laws are presumptively constitutional under *Bruen*, and facial challenges to them are not subject to *Bruen*'s text-and-history analysis.

Michigan's regime is a "shall-issue" one, which the Supreme Court has endorsed as presumptively lawful. Plaintiffs assert that Michigan must come forward with historical analogues of constituent parts of its shall-issue regime to pass Second Amendment muster. (*See, e.g.,* Compl, ¶ 159.) The Supreme Court, as understood by several federal circuits and legal scholars, disagrees. Jumping straight to requiring historical analogues to justify constituent parts of a "shall-issue" regime would fail to follow *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). The text-and-history test does not directly apply to shall-issue licensing regimes—one where an applicant's "general desire for self-defense is sufficient to obtain a [permit]." *Bruen,* 597 U.S. at 38 n.9 (citation omitted). We know this for a few reasons.

#### 1. The Supreme Court places shall-issue licensing regimes outside of *Bruen*'s historical analysis.

First, in *Heller*, this Court identified laws like these—those "imposing conditions and qualifications on the commercial sale of arms"—as "presumptively lawful regulatory measures." 554 U.S. at 626–627. Such a regime may include requirements setting guardrails that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' " *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635). Some of the permissible requirements of a "shall-issue" regime include, but are not limited to,

"fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force[.]" 597 U.S. at 80 (Kavanaugh, J., concurring). As long as these measures permit ordinary citizens to exercise their second Amendment rights, they are presumptively constitutional. 597 U.S. at 38 n.9.

Notably, in *Bruen*, the plain fact that the Court struck down New York's may-issue regime through the absence of any historical tradition of requiring a demonstration of a special need for self-defense but then went on at length about the presumptive validity of shall-issue regimes in footnotes 1 and 9, shows that the Court did so to *limit* its holding, setting its contours. That intent is clear: "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 597 U.S. at 39 fn. 9.

Several scholars understand *Bruen*'s footnote 9 as setting shall-issue regimes outside of the two-step inquiry. Professor Nelson Lund notes that the Court did not support its presumptively lawful shall-issue gloss with any discussion of historical analogues, Nelson Lund, *Bruen's Preliminary Preservation of the Second Amendment*, 23 Federalist Society Review 279, 292 (2022), suggesting that shall-issue regimes are not subject to the standard *Bruen* two-step.[2] Similarly, "the Court sent mixed signals by expressly affirming the constitutionality of modern nondiscretionary laws governing concealed carry licenses" (i.e., "shall issue" laws),

[2] https://fedsoc.org/fedsoc-review/bruen-s-preliminary-preservation-of-the-second-amendment

even though "[t]he majority did not suggest those laws could satisfy its history-only test." Jacob D. Charles, *The Dead Hand of a Silent Past:* Bruen*, Gun Rights, and the Shackles of History*, 73 Duke Law Journal 67, 91 (2023). *See also* Adam M. Samaha, *Is Bruen Constitutional*? *On the Methodology that Saved Most Gun Licensing*, 98 N.Y.U. L. Rev. 1928, 1929 (2023) ("[N]ot a single Justice in [*Bruen*] questioned the now-popular 'shall-issue' licensing regimes for concealed carry of firearms[.]").

Whatever the reason for singling out shall-issue regimes as presumptively constitutional, and for doing so without the full text-and-history analysis, the fact remains: shall-issue regimes are presumptively lawful. *Bruen* itself sanctioned shall-issue regimes despite no discussion of supportive and relevant historical analogues. That alone is ample evidence that the Court does not conceive of shall-issue regimes as other types of regulation that must be run through the *Bruen* text-and-history grinder.

As long as the "shall-issue" regulatory regime does not "grant open-ended discretion to licensing officials and do[es] not require a showing of some special need apart from self-defense," *id*. at 80 (Kavanaugh, J., concurring), those components should remain clothed in the presumption of constitutionality*, id.* at 38 n.9. This Court's review of the individual components is constrained to whether those components are being put toward "abusive ends" that have the functional effect of "deny[ing] ordinary citizens their right to public carry," *id*., i.e., as-applied challenges.

Several circuits have similarly found shall-issue regimes to be presumptively lawful under *Heller* and *Bruen*, though several have placed that analytic step within *Bruen*'s "text" inquiry, holding that it answers whether the plain text of the Second Amendment covers regulations on the acquisition of firearms. Reviewing *Heller*, *McDonald*, *Bruen*, and *Rahimi*, the Tenth Circuit found that each decision repeated the principle that conditions and qualifications on the commercial sale of arms have a "presumption of legality" and thereby rest in a "safe harbor." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119 (10th Cir. 2024). Similarly, the Ninth Circuit determined "the most reasonable interpretation" of *Bruen* is that "commercial restrictions presumptively do not implicate the plain text of the Second Amendment." *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 119 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1958 (2025).

Likewise, the Fifth Circuit parried a Second Amendment challenge to NICS background checks, finding that *Bruen*'s footnote 9 "plainly foreclose[d]" it, absent a showing that the system was "put toward abusive ends." *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024).[3] The Fourth Circuit also found that shall-issue regimes will typically be presumptively constitutional, and that only when the challenger rebuts that presumption does the burden shift back to the government to

[3] *McRorey* premised this on its understanding that purchasing firearms does not implicate the plain text of the Amendment, which protects only the right "to keep and bear arms." *McRorey*, 99 F.4th at 838. This Circuit has decided this question differently. *United States v. Knipp*, 138 F.4th 429, 434 (6th Cir. 2025) (holding that "although the Second Amendment's text does not spell out the right to obtain firearms, it nonetheless 'covers' that right.").

prove up a historical tradition. *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 224–25 (4th Cir. 2024), *cert. denied,* 145 S. Ct. 1049 (2025).[4]

In short, as the Supreme Court has explained and the Fourth, Fifth, Ninth, and Tenth Circuits have recognized, shall-issue licensing schemes, such as the LTP framework at issue here, are presumptively lawful and should therefore not be subject to the text-and-history analysis addressed below in Part I.B.

#### 2. The Supreme Court has endorsed similar shall-issue regimes like § 2 as presumptively constitutional.

To confirm this conclusion, we need only look to the Supreme Court's endorsement of shall-issue regimes comparable to Michigan's. The Court detailed and approved multiple states' public carry permitting process that are comparable to Michigan's LTP framework.

For example, in counting the presumptively valid shall-issue regimes, the Court included Connecticut, which it described as granting to officials the "discretion to deny a concealed-carry permit to anyone who is not a 'suitable person,' see Conn. Gen. Stat. § 29–28(b)," where "the 'suitable person' standard precludes permits only to those 'individuals whose conduct has shown them to be lacking the

[4] Indeed, the D.C. Circuit distances itself from these circuits, but the helpfulness of that decision is minimal given that it only entertained as-applied challenges, not facial ones like the State is defending here. *See Sedita v. United States*, 763 F. Supp. 3d 63, 77 (D.D.C. 2025) ("respectfully disagree[ing] with the approach taken by these courts"); *see also id.* at 74 n.5 ("Sedita drop[ped] the facial challenge in his opposition briefing" so it is not at issue). That said, Michigan's Court of Appeals has recognized that the meaning in *Bruen's* footnote 9 "could not be clearer: Shall-issue permitting schemes are not inherently violative of the Second Amendment." *People v. Langston*, 35 N.W.3d 381, 385 (Mich. Ct. App. 2024).

essential character of temperament necessary to be entrusted with a weapon.' " *Bruen*, 597 U.S. at 13, fn.1 (quoting *Dwyer v. Farrell*, 193 Conn. 7, 12, 475 A.2d 257, 260 (1984) (internal quotation marks omitted)). The Court also counted Rhode Island, with its "suitability requirement, see R. I. Gen. Laws § 11–47–11," where "the Rhode Island Supreme Court has flatly denied that the '[d]emonstration of a proper showing of need' is a component of that requirement." *Bruen*, 597 U.S. at 13 n.1 (quoting *Gadomski v. Tavares*, 113 A.3d 387, 392 (2015)).

These two examples make clear that some modicum of discretion in the hands of the permitting authority does not impact an otherwise shall-issue regime's constitutionality. Because both systems, like Michigan—which only permits law enforcement to deny a qualified applicant a permit where it finds probable cause of a threat to the applicant or others, or probable cause that the applicant will use the firearm to commit a crime—are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,' " the Supreme Court deems them presumptively constitutional. *Bruen*, 597 U.S. at 39, fn.9.[5]

Michigan is no outlier, either. In addition to Rhode Island and Connecticut, several other states have similar provisions, either for a firearm purchase permit or a concealed carry permit. For a sample, *see* Minn. Stat. § 624.7132, subd. 5(b) ("A chief of police or sheriff shall deny an application [for a pistol transfer permit] if

[5] This deference to state "shall-issue" regimes does not mean, of course, that they are per se consistent with the Second Amendment. As-applied challenges may be available where a "shall-issue" regime is "put toward abusive ends . . . where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n. 9.

there exists a *substantial likelihood* that the proposed transferee is *a danger to self or the public* when in possession of a firearm."); Colo. Rev. Stat. § 18-12-203(2) ("[I]f the sheriff has a *reasonable belief* that documented previous behavior by the applicant makes it likely the applicant will present *a danger to self or others* if the applicant receives a permit to carry a concealed handgun, the sheriff may deny the permit."); Iowa Code § 724.8(3) ("No . . . permit to carry weapons shall be issued to a person" where "*Probable cause* exists to believe, based upon documented specific actions of the person, where at least one of the actions occurred within two years immediately preceding the date of the permit application, that the person is *likely to use a weapon unlawfully* or in such other manner as *would endanger the person's self or others*."); Mont. Code § 45-8-321(2) ("The sheriff may deny an applicant a permit to carry a concealed weapon if the sheriff has *reasonable cause to believe* that the applicant . . . *may be a threat to the peace and good order of the community* to the extent that the applicant should not be allowed to carry a concealed weapon.").

Section 2 of Michigan's LTP framework is well within the range standards for permit denial in this area, and each of these States' licensing regimes was endorsed by *Bruen*. 597 U.S. at 13 n.1. Like many States, Michigan has exercised its latitude to protect its citizens by attempting to ensure that dangerous individuals are unable to purchase weapons. And where the Supreme Court has recognized that such licensing schemes are presumptively lawful, this should not disturb Michigan's justified choice to adopt its LTP framework.

### B. Michigan's LTP framework is consistent with the Nation's historical tradition of firearm regulations.

Even if this Court were to apply *Bruen's* text-and-history analysis, the Supreme Court's Second Amendment jurisprudence, from *Heller* through *Rahimi*, has consistently recognized that the right to keep and bear arms does not extend to individuals who pose a danger to themselves or others. Section 2(3) focuses precisely on this population, allowing officials to deny an LTP where law enforcement officials have probable cause to believe that, with a firearm, that person would be dangerous. The historical record shows that governments have for centuries exercised the authority to disarm those individuals.

Again, Michigan's statute mandates that permit issuers "shall with due speed and diligence issue licenses" to "qualified applicants" unless the issuer "has probable cause to believe that the applicant would be a threat to the applicant or to other individuals, or would commit an offense with the firearm that would violate a law of this or another state or of the United States." Mich. Comp. Laws § 28.422(3). As set forth below, this framework comports with *Bruen*.

#### 1. When a firearm regulation is consistent with principles that underpin our country's regulatory tradition, the regulation does not violate the Second Amendment.

In *Bruen*, the Supreme Court generally adopted a text-and-history standard for evaluating Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. Under that standard, the government is obliged to "demonstrate that the regulation is consistent with this Nation's

historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

The Court explained that this historical inquiry "will often involve reasoning by analogy," which "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* at 30. Courts assessing whether a historical regulation is a proper analogue for a modern one should ask "how and why the regulations burden a law-abiding citizen's right to armed self-defense," since those metrics go to "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* This inquiry, the Court cautioned, is not "a regulatory straightjacket"—a modern regulation "still may be analogous enough to pass constitutional muster" even if it is "not a dead ringer for historical precursors." *Id.*

In *United States v. Rahimi*, 602 U.S. 680 (2024), the Court clarified how that analogical inquiry should be conducted. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692 (citing *Bruen*, 597 U.S. at 26–31). A court must determine whether the challenged law is "relevantly similar" to historically permissible regulations, "appl[ying] faithfully the balance struck by the founding generation to modern circumstances." *Id.* (quoting *Bruen*, 597 U.S. at 29 &

n.7). "Why and how the regulation burdens the right are central to this inquiry," and, consistent with *Bruen*, a regulation that does not precisely match its historical precursors "still may be analogous enough to pass constitutional muster." *Id.* (quoting *Bruen*, 597 U.S. at 30).

*Rahimi* underscored that this framework does not require a founding-era statute addressing the precise conduct or precise class of persons at issue. The Court rejected the notion that the Second Amendment is "a law trapped in amber," reaffirming that "the right was never thought to sweep indiscriminately," and that our regulatory tradition has always accommodated laws disarming those who "present a credible threat to the physical safety of others." *Id.* at 691. Under *Bruen* and *Rahimi*, the relevant test is therefore whether the challenged law and its historical analogues impose a comparable burden on the right of armed self-defense that is comparably justified—not whether the modern law and a historical statute are mirror images of one another. *Bruen*, 597 U.S. at 29.

Michigan's LTP framework satisfies this test.

**2. Michigan's scheme only targets an individual's dangerousness, which the Supreme Court has repeatedly pronounced as appropriate.**

In *Heller*, the Court held that the Second Amendment protects the right to possess firearms, but it was careful to cabin that holding. It deemed "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms" as "presumptively lawful regulatory measures" that the Second Amendment leaves

undisturbed. *Id.* at 626–27 & n. 26. Moreover, *Heller* made clear that the right it recognized belongs to "law-abiding, responsible citizens"—language the Court has since repeated to distinguish the constitutionally protected class from those who, by virtue of dangerousness or unlawful conduct, fall outside. *Id.* at 635; *Bruen*, 597 U.S. at 29.

The Court reaffirmed this limitation two years later when it incorporated the Second Amendment against the states. In *McDonald v. City of Chicago*, the Court stated plainly: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms," and "repeat[ed] those assurances" again. 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626–27). Far from retreating from that principle, in *Bruen*, the Court reinforced it, framing the right throughout its opinion as one belonging to "ordinary, law-abiding citizens." 597 U.S. 1, 8 (2022).

*Rahimi* built on this foundation and confirmed that the government may disarm a person upon a finding that he presents a danger, even before he has committed any crime with a firearm. Surveying historical laws (explained more fully below), the Court explained that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *United States v. Rahimi*, 602 U.S. 680, 698 (2024). The Court's holding was framed in precisely these terms: "Our tradition of firearm regulation allows the Government

to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 700. Justice Barrett issued a concurrence stating even more broadly that, "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 710 (Barrett, J., concurring).

Read together, *Heller*, *McDonald*, *Bruen*, and *Rahimi* establish a consistent principle: the Second Amendment has never been understood to prevent the government from withholding or removing that right from individuals who present a danger to themselves or others. The Second Circuit found that "the use of dangerousness as a disqualifier does not appear controversial." *Antonyuk v. James*, 120 F.4th 941, 984 (2d Cir. 2024); *id.* at 984 fn. 31 (collecting several cases and authorities); see also *Kanter v. Barr*, 919 F.3d 437, 451, 464–465 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*.") (emphasis in original)).

Quite simply, this Court need go no further than applying *Bruen* and *Rahimi*.

### 3. Section 2 provides narrow, objective, and definite standards to guide law enforcement officials in the processing of LTP application.

Michigan's statute focuses intently on a specific individual's "dangerousness"—not their particularized need for self-defense or generic "character"—and requires an objective finding that the applicant is dangerous. Unlike the standardless "special need" inquiry invalidated in *Bruen*, § 2(3)

conditions denial on "probable cause" that the person would be dangerous, using a term of art whose content the Supreme Court has defined with precision for generations. The standard demands objectively articulable facts sufficient to warrant a reasonable official's belief, assessed without regard to the official's subjective motivations, and that official's determination is reviewable on an objective record.

In Michigan, when the Legislature uses a settled legal term of art, that term "must be construed in accordance with its peculiar and appropriate legal meaning." *Brackett v. Focus Hope, Inc.*, 482 Mich. 269, 276 (2008). *See also* Mich. Comp. Laws § 8.3a. Certainly, "probable cause" fits the bill.

Specifically, "probable cause" requires "more than bare suspicion." *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949). It "exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* (citation omitted; cleaned up); see also *People v Champion*, 549 N.W.2d 849, 860 (Mich. 1996) (applying the same definition of probable cause). Perhaps most importantly, "probable cause" can be established only by "objective" facts, not on an officer's subjective beliefs. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

What's more, probable cause demands a "totality-of-the-circumstances analysis" to support "a practical, common-sense decision." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The inquiry "depends upon the reasonable conclusion to be drawn

from the facts known to the arresting officer at the time of the arrest." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citing *Devenpeck,* 543 U.S. at 152). That evidence should be "supported by reasonably trustworthy information," and "the initial probable cause determination must be founded on both the inculpatory *and* exculpatory evidence known to the arresting officer"—"the officer cannot simply turn a blind eye toward potentially exculpatory evidence." *Logsdon*, 492 F.3d at 341 (cleaned up; emphasis in original).

In sum, a finding cannot rest on hunches, categorical assumptions, or the official's personal views of the applicant—because the Legislature required probable cause to deny an LTP application, § 2(3) only allows denial when, from the facts known to the official processing the application, the official has probable cause to believe that the applicant is a threat to himself or others. This is a far cry from the "spongy concept[s] susceptible to abuse[,]" *Antonyuk*, 120 F. 4th at 986, such as the proper-cause requirement struck down in *Bruen*, and this Court should accordingly reject Plaintiffs' facial challenge here.

#### 4. This Nation's historical tradition of firearm regulations reinforces the constitutionality of Michigan's LTP framework.

As shown below, federal courts across the country, including the Sixth Circuit, have repeatedly found a historical tradition of disarming dangerous individuals. Michigan's challenged law is both focused on dangerousness and requires objective specificity, setting Michigan's as *more* protective of individuals' rights than other state laws and historical corollaries.

**a. Disarmament Laws**

Multiple federal courts, including the Sixth Circuit, have documented the extensive history of laws that permitted the government to disqualify dangerous individuals from possessing or carrying firearms. Before, during, and after the Founding, authorities were permitted, or even obligated, to refuse weapons to those deemed dangerous, often creating categorical proxies for dangerousness, i.e., even without individualized assessments. In short, "dangerousness is the touchstone of disarmament laws." Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 3 (2024). Early Americans "believed that certain classes of people posed a great risk of violence," *United States v. Williams*, 113 F.4th 637, 650 (6th Cir. 2024), and "could be forbidden from owning firearms" unless "those individuals could show they did not pose such a risk." *Id.*

Before the Founding, English common law provides numerous examples "demonstrat[ing] that early English kings and Parliament alike disarmed individuals they deemed dangerous." *Williams*, 113 F.4th at 650. Intent on "maintaining peace," English kings routinely "disarm[ed] dangerous individuals," as did the common law and statutory law, *id.* at 650. Those intending to "terrify the King's subjects" were forbidden from "walk[ing] about the streets armed with guns." *Id.* at 650 (citing *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Statutory law, on the books "[a]s early as 1328" was intended to "reduce violence among everyday subjects. It targeted those who carried arms 'in such a manner as will naturally cause a terror to the people' or cause '*suspicion of an intention to*

*commit any act of violence.*' " 113 F.4th 637, 650 (quoting William Hawkins, *A Treatise of the Pleas of the Crown* ch. 63, §§ 4, 9, 266–67 (6th ed. 1788) (1716) (emphasis added)). Those covered were subject to "forfeiture of the arms." *Id.* at 650 (quoting 5 Blackstone, *Commentaries* 149 (St. George Tucker ed. 1803) (1767)). That tradition lasted for centuries. "In England, officers of the Crown had the power to disarm anyone they judged to be 'dangerous to the Peace of the Kingdom.'" *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (quoting Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)).

Later, the English Bill of Rights as of 1689 gave Parliament "the authority to delineate which community members 'may have Arms for their Defence suitable to their Conditions, and as allowed by Law.' " *Matter of M.U.'s Application for a Handgun Purchase Permit*, 475 N.J. Super. 148, 185 (App. Div. 2023) (quoting 1 W. & M. Sess. 2, ch. 2, § 7 (Eng. 1689)). Entire classes of religious adherents were "disarmed by the restored Stuart monarchs." 475 N.J. Super. at 185; *see also Williams*, 113 F.4th at 651 ("Disarming a group of individuals they thought dangerous would help Parliament prevent social upheaval and rebellion.").

This government practice was not a relic of a particular period in English history; rather, it was consistent through 1757—during the lifespan of the Founders. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405–06 (2019). And pre-Founding America carried over this respect for keeping the peace. "[T]he desire to promote peace by disarming dangerous groups arrived

intact." *Williams*, 113 F.4th at 652. In 1637, the Massachusetts Bay Colony stripped "seditious libelers" of their arms, although their rights could be restored "once they were deemed not dangerous." *Id.* (citing 1 Records of the Governor and Company of the Massachusetts Bay in New England 211–12 (Nathaniel B. Shurtleff ed., 1853)). Similarly, indigenous peoples were thought to be dangerous to the early settlements and, "out of concern for public safety," "two colonies punished with death citizens caught providing arms to Native Americans." 113 F.4th at 652 (collecting authorities).

And as revolution emerged, "[t]o avoid the possibility of additional bloodshed, the Continental Congress recommended that the colonies disarm loyalists." *Williams*, 113 F.4th at 653 (citing 1 *Journals of the American Congress*, at 285 (Washington, Way & Gideon 1823)). Several states did so—even those, like Pennsylvania, *which had enshrined their own right to keep and bear arms*—citing the concern of "dangerous" individuals. *Williams*, 113 F.4th at 654 & n.11; *see also id.* at 654 ("New Jersey directed officials to disarm 'such Persons as they shall judge disaffected and dangerous to the present Government.' " (quoting An Act for Constituting a Council of Safety, 1777 N.J. Laws 84, 90)); *see also Koons v. Platkin*, 673 F. Supp. 3d 515, 566 (D.N.J. 2023) ("Connecticut, Massachusetts, North Carolina, Virginia, and Pennsylvania enacted laws allowing government officials to disarm colonists who refused to swear allegiance to America.").[6]

[6] The district court decision was affirmed in part, vacated in part, and reversed in part *sub nom. Koons v. Att'y Gen. New Jersey*, 156 F.4th 210 (3d Cir. 2025), *as amended* (Sept. 17, 2025), *reh'g en banc granted, opinion vacated,* 162 F.4th 100 (3d

In 1776, New York's Provincial Congress passed a law to disarm British loyalists, "deem[ing] it 'absolutely necessary, not only for the safety of the . . . Province, but of the United Colonies in general, to take away the arms and accoutrements of the most dangerous among them [i.e., the loyalists]," Greenlee, 16 Drexel L. Rev. at 55–56 & n.346 (quoting Regulations respecting persons who are disarmed on account of their inimical principles (May 11, 1776), *in* 5 American Archives, ser. 4, at 1504 (Washington, M. St. Clair Clarke & Peter Force 1844)), and then "arm[ed] its own people with the arms of disarmed loyalists." *Id.*

A decade later, in reaction to Shay's Rebellion, an armed uprising in Massachusetts, the legislature permitted the governor to grant pardons to rebels, if they swore allegiance and surrendered their arms to the Justice of the Peace. 1787 Mass. Acts 555, ch. VI; *see also* Duke Center for Firearms Law, *Disarmament of those Disaffected to the Cause of America*, June 26, 2019.[7] Like Pennsylvania's, this law is striking given that Massachusetts also constitutionally protected the right to bear arms. Mass. Const. pt. 1, art. XVII (1780).

Several state delegates from Massachusetts (including Samuel Adams), New Hampshire, and Pennsylvania offered proposed language for protection of a right to

---

Cir. 2025). The district court decision was appealed, but on appeal the relevant plaintiffs "abandon[ed] their challenges to . . . the character-based disqualifications for firearm purchase permits, § 2C:58-3(c)." *Koons v. Att'y Gen. New Jersey*, 156 F.4th 210, 222 n.3 (3d Cir.). So the district court's analysis and ruling on this issue remain intact.

[7] Available at https://firearmslaw.duke.edu/2019/06/miniseries-part-ii-disarmament-of-those-disaffected-to-the-cause-of-america

bear arms that included limiting language—language tied explicitly to individuals' dangerousness. *Kanter*, 919 F.3d at 454–456 (Barrett, J., dissenting); *see also id.* at 456 ("The concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury. . . . This is the same concern that animated English and early American restrictions on arms possession."); *Williams*, 113 F.4th at 654–55. Even though the delegates' proposals ultimately did not prevail in changing the text of the Second Amendment, "these provisions still reveal a great deal" about it. *Williams*, 113 F.4th at 655. Ultimately, "because the Amendment codified a pre-existing and widely understood right, it's unlikely that 'different people of the founding period had vastly different conceptions' of that right's scope." *Id.* (quoting *Heller*, 554 U.S. at 603–05).[8]

Post-Founding, the tradition continued: governments saw fit to disarm classes of individuals then-deemed to be threats to pose "immediate threats to public safety," including several state laws barring slaves and Native Americans, *Kanter*, 919 F.3d at 458, as well as freed slaves, *Williams*, 113 F.4th at 656, from owning arms. "Classifying people as dangerous simply because of their race or religion was wrong from the beginning and unconstitutional from 1868. Nevertheless, these pre-Fourteenth Amendment laws provide insight into how early

[8] As Justice Scalia stated, " 'their writings, like those of other intelligent and informed people of the time, display how the text of the Constitution was originally understood.' " Amul R. Thapar & Joe Masterman, *Fidelity and Construction*, 129 Yale L.J. 774, 797 (2020) (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 38 (Amy Gutmann ed., 1997)).

Americans conceived of the right to bear arms embodied in the Second Amendment." *Williams*, 113 F.4th at 656.

This history establishes a long tradition, from medieval England through Reconstruction, focused on a single organizing principle: dangerousness. While status, commission of crime, or other classification may have contributed to a finding of dangerousness, it was not so limited. These sources demonstrate that the "why" of this tradition of disarmament is to preserve the peace and prevent violence by keeping weapons out of the hands of those who present a danger to others.

That is precisely the purpose and effect of § 2(3), which conditions denial of a purchase permit on a showing of probable cause that the applicant "would be a threat to himself or others," or would commit a crime "with the firearm." This is the same basic purpose animating, among others, the Militia Act of 1662's disarmament of persons "dangerous to the Peace of the Kingdom," the Massachusetts Bay Colony's 1637 disarmament of "seditious libelers," the Continental Congress's 1776 recommendation to disarm those "notoriously disaffected to the cause of America," and New Jersey's 1777 authorization to strip arms from persons "judge[d] . . . dangerous to the present Government."

The "how" tracks as well. In fact, § 2(3) burdens the right to bear arms even less than many of the data points in this tradition. Dangerousness determinations were made by executive and local officials, frequently relying on categorical proxies for danger (group affiliation, perceived disloyalty, religious identity) rather than individualized, evidence-based findings about a specific person's conduct. In

contrast, Michigan's challenged law requires an objective, individualized, fact-specific showing of probable cause—not a one-size-fits-all group membership or status. If the Nation's historical tradition permitted disarming categories of people on generalized suspicion of dangerousness, the Second Amendment must permit Michigan's targeted, evidence-based mechanism to withhold a permit from a specific applicant.[9]

Finally, like much of the historical tradition, Michigan's law does not have permanent consequences. As the Sixth Circuit recognized in *Williams*, "the historical study reveals that governments in England and colonial America long disarmed groups that they deemed to be dangerous," but "[e]ach time" individuals had an opportunity to "demonstrate that their particular possession of a weapon posed no danger to peace." *Williams*, 113 F.4th at 657. For example, the Massachusetts Bay Colony restored the arms of "seditious libelers" once they were "deemed not dangerous." *Id.* at 652.

This same logic underlies Michigan's scheme: a denial under § 2(3) is not a categorical, permanent bar but a determination tied to the applicant's circumstances at the time of application. Nothing in the statute limits the frequency of reapplication, in contrast to, for example, the express one-petition-per-year limit the Legislature imposed on restoration petitions under Mich. Comp. Laws

---

[9] One more point worth emphasizing. Section 2(3) operates as a pre-acquisition barrier while many of the historical sources authorized confiscation of property, a notably more severe sanction. *See, e.g., Williams*, 113 F.4th at 652–54 (loyalist disarmament statutes); 1787 Mass. Acts 555, ch. VI (post-Shays' Rebellion disarmament).

§ 28.424(3). In short, consistent with the historical tradition, an applicant denied under § 2(3) may successfully reapply once circumstances no longer support a probable-cause finding of dangerousness.

In short, these disarmament laws provide substantial historical analogues demonstrating that Michigan's LTP framework is consistent with our country's tradition of firearm regulation.

#### b. Surety Laws

The Supreme Court recognized another historical through-line that supports the constitutionality of § 2(3). "From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693. From as early as the 11th and 12th centuries, the common law categorized "go[ing] armed to terrify the King's subjects" as a "great offence." *Id.* at 693–694. As the laws developed through the centuries, "two distinct legal regimes had developed that specifically addressed firearms violence." *Id.* at 694–695.

Relevant here, surety laws "authorized magistrates to require individuals suspected of *future misbehavior* to post a bond." *Id.* at 695 (emphasis added); see also *id.* ("Under the surety laws, a magistrate could "oblige those persons, of whom there is a *probable ground to suspect of future misbehaviour*, to stipulate with and to give full assurance that such offence shall not happen, by finding pledges or securities.") (cleaned up; emphasis added) (quoting 4 W. Blackstone, *Commentaries*

*on the Laws of England* 251 (10th ed. 1787) (Blackstone)). *See also Williams*, 113 F.4th at 650.

Surety laws were understood as "preventive justice," 4 W. Blackstone, *Commentaries on the Laws of England*, Ch. 18 (1767), by "depriv[ing]" a dangerous person "of any power to do future mischief," and to "prevent[ ] future crimes," *id.* at 249.[10] The surety regimes varied in their mechanics, but some bonds could be forfeited if a person simply possessed weapons—these laws "expressly limited some forms of weapons possession." Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 295–96 (2021).

In the mid-19th century, consistent with English common law, Massachusetts adopted a surety statute that "*presumed* that individuals had a right to public carry that could be burdened only if another could make out a *specific showing of 'reasonable cause to fear an injury, or breach of the peace.'* " *Bruen*, 597 U.S. at 56 (quoting Mass. Rev. Stat., ch. 134, § 16 (1836)) (second emphasis added). During that period, "nine other jurisdictions," including Michigan, "adopted variants of the Massachusetts law." *Id.* at 56.

Michigan's challenged scheme reflects this tradition. Section 2(3)'s disqualification provision is premised on the threat of "future misbehavior," just as the surety laws described in *Rahimi*. 602 U.S. at 695. The quantum of evidence

---

[10] See The Avalon Project, https://avalon.law.yale.edu/18th_century/blackstone_bk4ch18.asp

required in Michigan also mirrors that reflected in Blackstone's survey of these surety laws. Compare *Rahimi*, 602 U.S. at 693 (quoting 4 Blackstone 251) ("probable ground to suspect of future misbehaviour") with § 2(3) ("probable cause to believe that the applicant would be a threat to the applicant or to other individuals"). Both old and new are examples of "preventative justice" where an individualized assessment is made about the risk of harm when granting a person the right to a firearm.

Like the disarmament laws, these surety laws provide ample historical analogues demonstrating that Michigan's LTP framework is consistent with our country's tradition of firearm regulation.

#### 5. Similar state laws permitting regimes have been found consistent with our Nation's history of firearm laws.

Plaintiffs also claim that § 2(3) violates the Second Amendment "because it subjects all law-abiding persons who do not possess a CPL to a licensing scheme that imposes discretionary, standardless, and abusive conditions on the exercise of the right to keep and bear arms." (Compl., ¶ 139.) The standard which Plaintiffs' appear to challenge—probable cause—is not "discretionary," "standardless," or "abusive." See Part I.B.3 above and Part II.A.1 below. In fact, laws like Michigan's have a long historical pedigree. "For as long as American jurisdictions have issued concealed-carry-licenses, they have permitted certain *individualized*, *discretionary determinations* by decisionmakers." *Antonyuk*, 120 F.4th at 987 (emphasis added).

For the most factually on point judicial analysis, one looks to *Koons v. Platkin*, 673 F. Supp. 3d 515, 552 (D. N.J. 2023), which considered a Second Amendment challenge to New Jersey's licensing scheme. "To obtain a handgun in New Jersey, an individual needs a permit to purchase a handgun ("Purchase Permit") and a[ ] [firearms purchaser identification card]." *Koons*, 673 F. Supp. 3d 515, 552. Similar to Michigan, "applications are made to the chief law enforcement officer of the municipality in which the applicant resides." *Koons*, 673 F. Supp. 3d at 554. And relevantly, the licensing authority allows denial of a purchase permit if the applicant "is known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others." N.J. Stat. Ann. § 2C:58-3(c). The court surveyed the same swath of history detailed above in Part I.B, *see Koons*, 673 F.Supp.3d at 563–569, found that it "reveal[ed] a historical tradition in this Nation of prohibiting dangerous individuals or those who would endanger the public from having firearms," and denied the Plaintiffs' Second Amendment challenges, determining that that New Jersey's "statutory disqualifiers follow that historical tradition and further[ ] it." *Id.* at 569.

In another post-*Bruen* case, the Second Circuit discarded a similar challenge to New York's revised concealed carry license requirement that the applicant have "good moral character," which is defined by New York statute as "having the essential character, temperament and judgment necessary to be entrusted with a

weapon and to use it only in a manner that does not endanger oneself or others." *Antonyuk*, 120 F.4th at 975; N.Y. Penal L. § 400.00(1)(b).[11]

Michigan's law is even more objective than the New Jersey and New York regimes, denying LTPs only upon the objective probable cause standard that a person would be a danger to himself or others or would commit a crime with the weapon.

In sum, Michigan's shall-issue regime falls squarely within *Bruen*'s approved regimes that are "presumptively lawful," is consistent with historical tradition of permitting governments to disarm individuals who pose a danger to themselves or others, and is even more circumspect, premised on objective and particularized information of dangerousness than other statutory schemes approved after *Bruen*.

What's more, given that their first claim is a facial challenge, it necessarily fails when considering how easy it is to imagine a circumstance where § 2(3)'s application is constitutional. For example, where police receive credible reports that in the month prior to submitting an LTP application, an applicant threatened his partner's life with violence and are able to verify those reports through their own investigatory efforts, the police would have probable cause to believe that the applicant was a threat to himself or others. In such circumstances, the denial of the LTP application would be supported by probable cause premised upon objective

---

[11] Notably, in New York, " 'Good moral character' appears to be a prerequisite for all types of firearm licenses," including purchase permits, not just concealed carry licenses. *Antonyuk*, 120 F.4th at 975.

facts. And if § 2(3)'s application is constitutional in such a hypothetical scenario, Plaintiffs' facial challenge must fail.

For these reasons, this Court should dismiss Plaintiffs' first claim which alleges that § 2(3) violates the Second Amendment.

### C. Requiring the provision of and government retention of accurate information about pistol purchasers is a de minimis "presumptively lawful regulatory measure."

For its third claim, Plaintiffs' lodge a Second Amendment objection to Mich. Comp. Laws § 28.422(5), which creates "mandatory disclosure obligations on individuals who acquire protected arms[,]" (Compl. ¶ 157), and requires that "the seller submit transaction documentation to a governmental authority for entry into a database maintained by the Michigan State Police[,]" (*Id.* ¶ 154). The required information includes "personal identifying information and firearm-specific information . . . for submission to and retention in government records." (Compl. ¶ 157.)

Plaintiffs' third claim fails for two reasons. First, Plaintiffs' third claim fails the first step of *Bruen's* text-and-history test—the Second Amendment's plain text does not cover a seller's post-sale conduct. And second, the reporting requirement is consistent with other information-retrieval provisions that have been found constitutional by other courts.

As for the first reason, the Supreme Court's two-step framework in *Bruen* is straightforward. "At the first step, courts look to the Amendment's plain text. If the text covers an individual's conduct, the Amendment presumptively protects that

conduct." *Knipp*, 138 F.4th at 433. And while this Circuit has held that the Second Amendment's text "covers" an individual's right to "obtain" firearms, *id.* at 434, it does not cover an individual's right to be free from the seller reporting the sale to the government.

In *Oakland Tactical Supply, LLC v. Howell Township*, the Sixth Circuit explained *Bruen* "does not say that any regulation that affects firearms must satisfy the historical-regulation test[,]" but instead "asks whether the proposed conduct affected by the challenged law is protected by 'the Second Amendment's plain text.'" 103 F.4th 1186, 1195 (6th Cir.) (2024) (quoting *Bruen*, 597 U.S. at 18)). The Sixth Circuit pointed out that, in *Bruen*, "the challenged law required gun-license applicants who sought to carry firearms in public to show 'proper cause' for the issuance of an unrestricted license to carry a concealed handgun." *Id.* at 1195 (quoting *Bruen*, 597 U.S. at 12–13). Importantly for analyses under the first step, "[t]he *Bruen* plaintiffs wished to carry their handguns in public for self-defense and applied for unrestricted licenses, which were denied for failure to show proper cause." *Id.* (quoting *Bruen*, 597 U.S. at 15–16). And in assessing whether Plaintiffs' proposed conduct was covered by the Amendment's plain text, the Supreme Court "incorporated the purpose and location of the plaintiffs' desired action" and "defined the 'proposed course of conduct' as 'carrying handguns publicly for self-defense,' which it found to be covered by the plain text[.]" *Id.* (quoting *Bruen*, 597 U.S. at 32).

Essentially, *Oakland Tactical* confirms that under *Bruen's* first-step, courts "must ask not simply whether the regulation affects firearms in some way, but

whether the regulation infringes the right to own and bear arms in case of confrontation." *Id.* at 1196. And where the challenged "regulation above does not restrict conduct necessary to effectuate that right, the proposed conduct . . . is not protected by the plain text of the Second Amendment and the regulation need not satisfy *Bruen*'s second step, even though it regulates conduct connected to firearms." *Id.* *Oakland Tactical* forecloses Plaintiffs' claims.

Section 2(5)'s reporting obligation does not "restrict conduct" that is "necessary to effectuate" "the right to own and bear arms in case of confrontation." By its own language, § 2(5) does not require a seller to report the transaction until "10 days after the date the pistol is purchased." Stated otherwise, an individual has already purchased the pistol before the seller is required to report the transaction. At its core, Plaintiffs' proposed conduct in their third claim is the right to purchase a pistol anonymously. But because this proposed conduct does not fall within the Second Amendment's plain text, Plaintiffs' third claim necessarily fails.

In fact, the Seventh Circuit recently addressed a similar requirement under federal law. Specifically, in *United States v. Scheidt*, the Court assessed a form which ATF created under 18 U.S.C. § 923(g)(1)(A) which "purchasers must complete before acquiring a firearm and that dealers must maintain after a sale." 103 F.4th 1281, 1282 (7th Cir. 2024). The form required "gun purchasers to provide personal information, such as their name, birth date, height, weight, and address" and advised that "making any false written statement with respect to the transaction, is a crime punishable as a felony under Federal law[.]" *Id.* (cleaned up). When the

criminal defendant in *Scheid* argued that "her prosecution as covered by the Second Amendment because Congress conditioned her right to purchase a firearm on completing ATF Form 4473[,]" the Seventh Circuit disagreed. *Id.* at 1283–1284.

In rejecting the argument, the Seventh Circuit "d[id] not see this as a Second Amendment case" as "[o]rdinary information-providing requirements . . . do not 'infringe' the right to keep and bear arms." *Id.* The Seventh Circuit further reasoned that completing the form "and adhering to its attendant truth-telling requirement, is conduct that is outside the scope of the Second Amendment's protections, not requiring application of *Bruen*'s historical analysis framework." *Id.* Ultimately, because "[t]he plain text of the Second Amendment does not cover [the defendant's proposed] conduct" of individual gun ownership, the Court held that "there is no need to conduct a historical analysis of gun registration forms." *Id.*; *see also United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024) (rejecting an argument that 18 U.S.C. § 922(a)(6) infringes upon a purchaser's Second Amendment rights[.]").

Even before *Bruen*, it appeared beyond debate that requirements like the one at issue here in § 2(5) were constitutionally sound. In *Abramski v. United States*, the Supreme Court understood that federal law (§ 922) requires submission of personal information to federally licensed firearm dealers. *See* 573 U.S. 169, 180 (2014). "[T]he statute establishes an elaborate system to verify a would-be gun purchaser's identity and check on his background" and "requires that the information so gathered go into a dealer's permanent records." *Abramski v. United*

*States*, 573 U.S. 169, 180 (2014). Purchasers must provide "the name, address, and age of the potential purchaser," "[a]nd that identification in turn permits a background check," which furthers the "twin goals of this comprehensive scheme": "to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes." *Abramski*, 573 U.S. at 180–81 (citing *Huddleston v. United States*, 415 U.S. 814, 824 (1974)).

Noting that "the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the Nation by population," the D.C. Circuit has also upheld basic registration requirements for handguns. *Heller v. D.C.*, 670 F.3d 1244, 1254 (D.C. Cir. 2011) (*Heller II*). More specifically, the Court declared that "basic registration requirements [for pistol acquisition] are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." *Id.* at 1254–55.

To borrow from the Seventh Circuit, "[t]he power to collect accurate information . . . stands on a firm[ ] footing." *United States v. Holden,* 70 F.4th 1015, 1017 (7th Cir. 2023). And because § 2(5)'s reporting requirement is not covered by the Second Amendment's plain text, Plaintiffs' third claim necessarily fails.

## II. Because Michigan's LTP scheme provides sufficient procedural due process, Plaintiffs' fifth and seventh claims must be dismissed.

In their fifth and seventh claims, Plaintiffs allege that the LTP framework violates the Constitution's guarantee of procedural due process, both by way of § 2(3)'s probable-cause exception and § 2(5)'s seller-reporting requirement. But like their Second Amendment challenges, Plaintiffs' facial challenges under the Fourteenth Amendment similarly fail.

### A. Section 2(3)'s probable-cause exception comports with the Fourteenth Amendment's Due Process Clause.

When viewed as a whole, Plaintiffs' procedural due-process challenge to § 2(3)'s probable-cause exception has at least two aspects. First, it has a vagueness aspect as Plaintiffs allege § 2(3) "creates a substantial risk of erroneous deprivation of liberty interests protected by the Fourteenth Amendment because it conditions the acquisition of protected arms on procedures that lack fair notice and are vague, standardless, discretionary." (Compl, ¶ 192.) Second, it has an adequacy-of-process aspect as Plaintiffs allege § 2(3) provides "no constitutionally adequate appeal process, no mandatory disclosure of the information relied upon, no meaningful opportunity to contest adverse information, and no procedure capable of reliably correcting erroneous denials." (*Id.*, ¶ 188.). Plaintiffs are mistaken.

#### 1. Section 2(3)'s probable-cause exception provides adequate and sufficiently clear notice.

Indeed, "[d]ue process requires a court to hold an ordinance or statute void for vagueness if its prohibitive terms are not clearly defined such that a person of

ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *Brown v. City of Albion*, 136 F.4th 331, 344 (6th Cir. 2025). Vague laws offend due process because courts "insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Further, "[v]ague laws trap the innocent by not providing fair warning[,] and "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id*. "To succeed on a vagueness claim, a plaintiff must show that the relevant ordinance "(1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement." *Blankenship v. Louisville-Jefferson Cnty., Kentucky Metro Gov't*, 162 F.4th 644, 661 (6th Cir. 2025).

Plaintiffs' due process claims fail under this rubric. As noted above in Part I.B.3, "probable cause" is a well-understood, legal term of art that is premised upon objective facts. *See Brinegar*, 338 U.S. at 175–76; *Devenpeck*, 543 U.S. at 153. And considering that law enforcement officers are the ones making the probable-cause determination under § 2(3), by operation of their role in making arrests and swearing out affidavits in support of warrants, law enforcement officers certainly have the necessary standards to determine whether there is probable cause to believe that an LTP applicant is a threat to himself or others. See *Grayned*, 408 U.S. at 108.

In short, given that "probable cause" is a legal term of art with which police officers are intimately familiar, § 2(3) necessarily provides the police with adequate standards to employ when processing an LTP application. And relatedly, any individual desiring to purchase a pistol under the LTP framework is more than capable of understanding what conduct is prohibited under § 2(1)(a). After all, § 2(1)(a) states that "[e]xcept as otherwise provided in this act, a person shall not . . . [p]urchase, carry, possess, or transport a pistol in this state without first having obtained a license[.]" The law could not be much clearer.

#### 2. Section 2(3)'s probable-cause exception provides adequate pre- and post-deprivation process.

In procedural due process challenges, it is worth keeping in mind what the Supreme described as "the essence of due process"—i.e., "the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (cleaned up). In assessing the process that is due, courts consider several factors: "the private interest that will be affected by the action;" "the risk of an erroneous deprivation of such interest through the procedures used;" "the probative value, if any, of additional or substitute procedural safeguards;" and "the Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

Importantly, "the requirements of due process are fluid and fact dependent" and "pre-and postdeprivation processes should be considered together as a single

package." *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015). What this means is that "the sufficiency of predeprivation procedures must be considered in conjunction with the options for postdeprivation review[,]" and "if elaborate procedures for postdeprivation review are in place, less elaborate predeprivation process may be required." *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 743 (6th Cir. 2000)). And "[i]n some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required." *Id.*

With § 2(3)'s probable-cause exception, though the right to bear arms is enshrined in the Second Amendment, "[a]s discussed above, our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous." *Williams*, 113 F.4th at 657. True enough, § 2(3) does not explicitly require a police department to document in detail the basis for a denial, and it may be possible in theory that a police department provides no information supporting the denial of an application. But given that this is a facial challenge, the mere possibility that such a denial could be issued is not grounds for striking the LTP scheme.

Moreover, when compared to the post-deprivation process that is guaranteed by Michigan's constitution, the impact of any deficiency in the pre-deprivation process is significantly limited. As noted at the outset, Michigan's constitution guarantees that "[a]ll final decisions . . . of any administrative officer or agency . . . which are judicial or quasi-judicial and affect private rights or licenses" are subject to direct review by the courts and that the review will assess whether those

decisions are "authorized by law." MICH. CONST. art. VI, § 28. Considering that that the right to acquire a firearm is a "private right" and that the police department's probable-cause determination fits within Michigan courts' definition of "quasi-judicial," a police department's denial of an LTP application is subject to direct review.[12] We also know that Michigan's circuit courts have jurisdiction over this direct review considering that appeals from final decisions of municipalities are brought by way of a complaint for superintending control. *See In re Payne*, 514 N.W.2d at 125. And what's more, the Sixth Circuit has observed that "[d]istrict judges serve the same function when they entertain as-applied challenges" to the applicability of a statute. *Williams*, 113 F4th at 657.

In short, considering that Plaintiffs' fifth claim is a facial challenge and that Michigan's constitution guarantees a direct review of a police department's licensure decision, Plaintiffs' procedural due process attack on Mich. Comp. Laws § 28.422(3) must fail.

### B. Section 2(5)'s reporting obligation does not implicate Plaintiffs due process rights.

In their seventh claim, Plaintiffs allege that § 2(5)'s reporting obligation violates due process as it exposes pistol purchasers to criminal liability for a seller's

---

[12] *See Midland Cogeneration Venture Ltd. P'ship v. Naftaly*, N.W.2d 674, 680 (Mich. 2011) (defining "quasi-judicial" to mean "[a] term applied to the . . . discretion . . . of public administrative officers, who are required to investigate facts, or ascertain the existence of facts, and draw conclusions from them, as a basis for their official action" and "private rights" to mean "a personal right, as opposed to a right of the public or the state.").

failure to report but "provides no clear, readily accessible, or constitutionally adequate mechanism for purchasers to compel seller compliance, confirm timely and accurate submission, cure seller noncompliance, or obtain meaningful pre-deprivation review before enforcement consequences may attach." (*Id.*, ¶ 221.) Plaintiffs simply misread what the law says.

Section 2(5)'s plain language, and the LPT scheme generally, simply doesn't work the way Plaintiffs say it does. As a matter of Michigan law, a seller's failure to file the required paperwork will not result in adverse consequences for a bona fide purchaser. To start, § 2(5)'s confirms that a firearm is "purchased or acquired," at the point of sale, i.e., before the seller ever has an opportunity to satisfy his own reporting obligations. It does not condition the vesting of a purchase or acquisition on future events. Accordingly, a purchaser who has been granted an LTP under § 2 holds the firearm lawfully, regardless of whether the seller fails to report the sale to police. Stated otherwise, a seller's subsequent administrative omission—such as failing to mail a duplicate form to the police within 10 days—does not retroactively change the legality of the purchaser's ongoing possession.

Furthermore, the LTP scheme prescribes an exact and exclusive penalty for sellers who fail to comply with § 2(5) (a fine of not more than $250). Under established Michigan law, when a statute creates a specific duty and explicitly prescribes the penalty for its violation, that penalty is exclusive. *Gen. Aviation, Inc. v. Capital Region Airport Auth.*, 569 N.W.2d 883, 885 (Mich. Ct. App. 1997) (citation omitted). And Michigan courts would view the specific penalty against sellers in

§ 2(5) as exclusive of the general penalty in § 14. In Michigan, courts make every effort to interpret a statute in a way that renders it constitutional, *People v. Skinner*, 917 N.W.2d 292, 302–03 (Mich. 2018) (collecting cases), and penalizing an innocent purchaser for the acts of a third party, whom he cannot control, would be unconstitutional.

In fact, "[i]n the absence of any indication that the Legislature intended to dispense with a *mens rea* requirement, [Michigan courts] must construe a criminal statute as impliedly requiring intent, knowledge, or recklessness." *Macomb Intermediate Sch. Dist. v. State*, ___ N.W.3d ___ (Mich. Ct. App. 2026) (2026 WL 979476, at *6). It follows, therefore, that Michigan courts would not countenance holding a purchaser criminally liable for a seller's violation absent a showing of knowledge, intent, or recklessness. Put differently, an innocent purchaser could not be convicted of a criminal offense due a seller's failure to report a sale.

As a result, particularly considering that it is a facial challenge, Plaintiffs' seventh claim fails under § 2(5)'s plain language and the manner in which Michigan courts would construe the Firearms Act.

## III. In their as-applied challenges, Plaintiffs fail to allege any personal involvement by Nessel and Grady in the alleged deprivation of their Second and Fourteenth Amendment claims.

To be clear, the complaint does not plainly include Nessel or Grady as defendants for the as-applied claims. Nessel is only present in two allegations which merely indicate that she is being sued in her official capacity as the Attorney General and has statewide authority to investigate prosecute indictable defenses.

(Compl, ¶¶ 15–16.) Similarly, Grady appears in only two allegations which also indicate that he is being sued in his official capacity as the director of the State Police and that the State Police "maintains the relevant firearms transaction database; promulgates and administers forms; receives and stores reporting information; and maintains denial information used by local agencies." (*Id.*, ¶¶ 17–18.) There are no allegations that either Nessel or Grady were involved in the denial of any of the Individual Plaintiffs' allegations, nor are there any allegations that Nessel or Grady engaged in any specific conduct affecting the rights of the Organizational Plaintiffs.

Thus, while they may be proper defendants to the facial attacks on § 2's constitutionality, to the extent the as-applied claims are brought against either Nessel or Grady, those claims (specifically, Plaintiffs' second, fourth, sixth, and eighth claims) must be dismissed. After all, to prevail in an action under 42 U.S.C. § 1983, plaintiff generally must prove both [1] that a defendant was *personally* at fault and [2] that the defendant's culpable conduct (not somebody else's) *caused* the injury." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490 (6th Cir. 2020). And where they fail to allege that their "injur[ies are] fairly traceable to the defendant[s'] conduct[,]" Plaintiffs cannot even establish Article III standing to support such a claim against Nessel or Grady. *See Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016) (setting forth the elements necessary to establish Article III standing).

Put simply, neither Nessel nor Grady has applied any aspect of § 2 to either the individual or organizational plaintiffs. For this reason, dismissal is required.

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, Defendants Dana Nessel and James Grady II respectfully request that this Court issue an order that both (1) dismisses Plaintiffs' facial challenges to the constitutionality of Mich. Comp. Laws § 28.422 and (2) dismisses any as-applied challenges addressed at either Nessel or Grady.

Respectfully submitted,

*/s/ Adam R. de Bear*
Adam R. de Bear (P80242)
Daniel J. Ping (P81482)
Assistant Attorneys General

Christopher M. Allen (P75329)
Assistant Solicitor General

Attorneys for Nessel and Grady II
Mich. Dep't of Attorney General
525 W Ottawa St
Lansing, MI 48933
(517) 335-7573
debeara@michigan.gov
pingd@michigan.gov
allenc28@michigan.gov

Dated: September 4, 2026

2026-0460759-A